| | | |
|---|---|---|
| ORLANDO VELEZ-SHADE, JR., | : | CIVIL CASE NO. |
|     Plaintiff, | : | 3:18cv1784(JCH) |
| | : | |
|     v. | : | |
| | : | SEPTEMBER 24, 2019 |
| POPULATION MANAGEMENT, ET AL., | : | |
|     Defendants. | : | |

## <u>INITIAL REVIEW ORDER</u>

The plaintiff, Orlando Velez-Shade, Jr. ("Velez-Shade"), is currently incarcerated

at MacDougall-Walker Correctional Institution ("MacDougall-Walker"). He initiated this

action by filing a civil rights complaint against Population Management, Director of

Security Antonio Santiago, Security Risk Group ("SRG") Coordinator John Aldi, District

Administrator Quiros, Warden Rodrigues, Captain Lizon, Lieutenant Alexander, Hearing

Officer Prior, Correctional Officers Betances, Clark, Richards and Rodriguez and

Mailroom Officer DeJesus.

Velez-Shade subsequently sought leave to amend his Complaint to add new

allegations against Director Santiago. On February 5, 2019, the court granted Velez-

Shade thirty days to file an amended complaint. Velez-Shade chose not to file an

amended complaint within the time specified. For the reasons set forth below, the

Complaint is dismissed in part.

## I.     STANDARD OF REVIEW

Pursuant to section 1915A(b) of title 28 of the United States Code, the court must

review prisoner civil complaints against governmental actors and dismiss any portion of

a complaint that is "frivolous, malicious, or fails to state a claim upon which relief may be

granted," or that "seeks monetary relief from a defendant who is immune from such

relief." 28 U.S.C. § 1915A(b).  This standard of review "appl[ies] to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid [a] filing fee."  Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004) (internal quotation marks and citation omitted).

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).   A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard.  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007)).  Although courts still have an obligation to interpret "a pro se complaint liberally," a complaint must still include sufficient factual allegations to meet the standard of facial plausibility.  See Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

## II.    FACTS

On June 16, 2018, Velez-Shade was housed in Building 4 at Carl Robinson Correctional Institution.  See Complaint ("Compl.") (Doc. No. 1) at 6 ¶ 1.[1]  As Velez-

---

[1] In citing to the Complaint, the court references the page numbers imposed by the court's electronic filing system.

Shade walked to the dining hall, he became involved in a physical altercation with two other inmates. See id. at 13. Correctional Officer Richards was present during the altercation but waited almost two minutes to intervene. See id. at 6 ¶ 3. Other correctional officers arrived at the scene, detained Velez-Shade, and escorted him to the restrictive housing unit ("RHU"). See id. at 7 ¶ 4. Velez-Shade remained in the RHU until June 22, 2018. Id. at 7 ¶ 5. On that date, Velez-Shade completed serving his sanction of seven days of confinement in punitive segregation and received other sanctions. See id. at 7 ¶ 5.

Before Velez-Shade was released from the RHU, Lieutenant Alexander issued him a disciplinary report for security risk group affiliation. See id. at 7 ¶ 6. The disciplinary report accused Velez-Shade of having been involved in a four-on-one altercation and included an unsupported allegation that the Department of Correction had "tracked [Velez-Shade] for an extended period of time . . . as an active Crip member." See id. at 13. Correctional Officers Clark and Betances investigated the disciplinary report. See id. at 7 ¶ 8.

On June 26, 2018, Velez-Shade appeared at a hearing with his advocate, Correctional Officer Rodriguez. See id. at 7 ¶ 9. Correctional Officers Clark and Betances were present at the hearing, and Officer Clark presented information pertaining to the investigation of the disciplinary charge. See id. at 7-8 ¶¶ 10-11. Lieutenant Prior refused to permit Velez-Shade to present his views either orally or in writing and would not let Velez-Shade review the source of information statement that was the basis of the issuance of the disciplinary report. See id. at 8 ¶¶ 12, 15-16. Lieutenant Prior stated that Velez-Shade was acting as a gang member because he

had participated in the altercation with other inmates on June 16, 2018.  See id. at 8 ¶ 17.  Lieutenant Prior found Velez-Shade guilty of being affiliated with a security risk group and designated him as a security risk group member.  See id. at 9 ¶ 21.

From June 16, 2018, to June 29, 2018, Velez-Shade was confined in the restrictive housing unit at Carl Robinson.  See id. at 9 ¶ 23.  He was not permitted to participate in outside recreation and his cell was illuminated by a bright light every day and night.  See id. at 9 ¶¶ 23-25.  He was unable to get enough sleep which caused him to experience "crucial symptoms of [his] P.T.S.D. as well as his bipolar one."  See id. at 9 ¶ 25.  He lost weight and muscle mass during his confinement in the restrictive housing unit because he could not exercise regularly.  See id. at 9 ¶ 26.

On June 29, 2018, prison officials transferred Velez-Shade to Northern Correctional Institution ("Northern") to be placed in the security risk group program.  See id. at 9 ¶ 27.  Mental health officials did not clear Velez-Shade for placement at Northern, and the Security Risk Group Review Committee did not review him for phase placement prior to his transfer.  See id. at 9-10 ¶ 27-29.

On July 1, 2018, Velez-Shade appealed Lieutenant Prior's finding of guilt as to charge of security risk group affiliation.  See id. at 10 ¶ 32.  On August 1, 2018, District Administrator Quiros denied the appeal and found no reason to modify the decision of the hearing officer.  See id. at 10 ¶ 35.

On August 3, 2018, Director of Security Santiago informed Velez-Shade that there were no documents responsive to his Freedom of Information Act request pertaining to the decision to designate him as an affiliated security risk group member.

See id. at 10 ¶ 38.  On October 5, 2018, Director Santiago informed Velez-Shade that he would remain in the security risk group program.  See id.

On August 8, 2018, Velez-Shade sent a letter to his aunt indicating that his due process rights had been violated and requested that she get him legal assistance.  See id. at 11 ¶ 39.  Officials at Northern censored Velez-Shade's outgoing mail without notification.  See id. at 11 ¶ 40.

During his confinement at Northern, prison officials strip-searched Velez-Shade every time he left his cell and required him to wear handcuffs behind his back during recreation.  See id. at 11 ¶ 1.  Velez-Shade could not exercise in restraints and the restraints caused pain in his shoulders.  See id. at 11 ¶¶ 2-3.  Captain Lizon and Warden Rodrigues required Velez-Shade to exercise outdoors during inclement weather.  See id. at 16.  Velez-Shade was bitten by insects during recreation because he could not swat them away.  See id. at 11 ¶ 6.  When it was raining, Velez-Shade became soaking wet and caught a cold.  See id. at 12 ¶ 7.

Prison officials required Velez-Shade to wear handcuffs, leg irons, and a belly chain connecting the handcuffs and leg irons when he made telephone calls to his family members.  See id. at 12 ¶ 9.  The restraints forced him to crouch down in an uncomfortable and painful position during his thirty-minute telephone calls.  See id. at 12 ¶¶ 10-12.

Between October 8 and 10, 2018, Velez-Shade was confined in a cell with a toilet that was backed up with urine and fecal matter from the cell next door.  See id. at 12 ¶ 13.  Captain Lizon and Warden Rodrigues required him to remain in the cell for forty hours before moving him to a new cell.  See id. at 12 ¶¶ 13–14; id. at 16-17.

## III.    DISCUSSION

Velez-Shade claims that the defendants violated his rights under the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and his rights under Article First, sections `4, 5, 8, 9, and 20 of the Connecticut Constitution.  He sues the defendants in both their individual and official capacities.

### A.    Population Management and SRG Coordinator Aldi

Velez-Shade has named "Population Management" and SRG Director Aldi as defendants, but asserts no factual allegations against either defendant.  The State of Connecticut Department of Correction website describes "Offender Classification and Population Management" as a "unit" that "coordinates overall offender classification efforts and is responsible for the assignment of offender movement throughout the entire infrastructure of the Department."  See Connecticut State Department of Correction, Offender Classification and Population Management, available at https://portal.ct.gov/DOC/Org/Offender-Classification-and-Population-Management.  Velez-Shade does not otherwise refer to the Offender Classification and Population Management unit other than in the caption and description of parties.  Thus, he has not alleged that the Offender Classification and Population Management unit has violated his federally or constitutionally protected rights.  Furthermore, a unit within the Department of Correction is not a person subject to liability under section 1983.  See Torres v. UConn Health, No. 3:17-CV-00325 (SRU), 2017 WL 3737945, at *1 (D. Conn. Aug. 29, 2017) (dismissing claims against the Department of Correction Correctional Transportation Unit because such entities are not "persons" within the meaning of section 1983).  All claims against Population Management are dismissed.  See 28 U.S.C. § 1915A(b)(1).

Velez-Shade does not mention SRG Coordinator Aldi in the body of the Complaint. In the section of the Complaint describing his legal claims, Velez-Shade contends that "Aldi and Santiago used readymade langue and violated my rights by failing to correct the misconduct and encouraging the continuation of the misconduct of all defendants." Compl. at 16. Velez-Shade does not allege that he wrote to or otherwise contacted Aldi or that Aldi wrote to or spoke to him in connection with his placement in the security risk group program. Thus, although he contends that Aldi violated his due process rights in connection with his placement in the program, there are no facts alleged to support this contention. Accordingly, the claim against SRG Director Aldi is dismissed. See 28 U.S.C. § 1915A(b)(1).

B.     Official Capacity Claims – Remaining Defendants

Velez-Shade seeks compensatory and punitive damages and a declaration that the defendants violated his federal constitutional rights. The Eleventh Amendment to the United States Constitution bars claims for monetary damages against a state actor acting in his official capacity, unless there is a waiver of this immunity by statute or the state consents to suit. See Kentucky v. Graham, 473 U.S. 159, 169 (1985).

There are no allegations that the State of Connecticut has consented to be sued for claims brought against the defendants under section 1983. Furthermore, section 1983 was not intended to override a state's sovereign immunity. See Quern v. Jordan, 440 U.S. 332, 342 (1979) (holding that section 1983 does not override a state's Eleventh Amendment immunity). Thus, to the extent that Velez-Shade seeks punitive and compensatory damages from the defendants in their official capacities, such a request for relief is barred by the Eleventh Amendment. Accordingly, the claims for

monetary damages against the defendants in their official capacities are dismissed. See 28 U.S.C. § 1915A(b)(2).

Velez-Shade seeks a declaration that the defendants violated his federal rights. Declaratory relief serves to "settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." Colabella v. American Institute of Certified Public Accountants, No. 10-cv-2291(KAM)(ALC), 2011 WL 4532132, at *22 (E.D.N.Y. Sept. 28, 2011) (citing Beacon Const. Co., Inc. v. Matco Elec. Co., Inc., 521 F.2d 392, 397 (2d Cir. 1975)). Declaratory relief operates in a prospective manner to allow parties to resolve claims before either side suffers great harm. See In re Combustion Equip. Assoc. Inc., 838 F.2d 35, 37 (2d Cir. 1988).

A party may seek prospective injunctive and declaratory relief against state officials acting in violation of federal law. See Ex Parte Young, 209 U.S. 123, 155-56 (1908). The Eleventh Amendment, however, precludes requests for declaratory or injunctive relief for past violations of federal law. See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993) (holding that Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past"); Green v. Mansour, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of Young, however, to claims for retrospective relief.") (citations omitted).

The allegations in the Complaint relate to the plaintiff's confinement at Carl Robinson from June 16, 2018 to June 29, 2018, and Northern from June 29, 2018 to October 10, 2018. Velez-Shade was incarcerated at MacDougall-Walker when he filed

this action and remains at MacDougall-Walker.  A request for a declaration that the defendants violated Velez-Shade's federal constitutional rights prior to October 11, 2018 cannot be properly characterized as "prospective" because Velez-Shade does not allege how such relief would remedy a future constitutional violation by the defendants. Thus, the request seeking declaratory relief for past constitutional violations is barred by the Eleventh Amendment.  See Green, 474 U.S. at 71-73 (holding that Eleventh Amendment bars retrospective declaratory judgment that state actors violated federal law absent allegation of ongoing violation).  The request seeking declaratory relief against the remaining defendants is dismissed.  See 28 U.S.C. § 1915A(b)(1).

     C.    First Amendment – Mail Interference

Velez-Shade alleges that, on one occasion in August 2018, he attempted to send a letter to his aunt describing how his "due process was violated" and also asking his aunt to secure legal assistance for him.  Compl. at 11 ¶ 39.  He claims that Mailroom Officer DeJesus censored his correspondence to his aunt.  See id. at 11 ¶ 40.  Velez-Shade did not receive a rejection notice or an explanation for the decision to censor the letter.  See id.

The First Amendment protects an inmate's right of access to the courts and access to the free flow of incoming and outgoing mail.  See Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (citing Heimerle v. Attorney General, 753 F.2d 10, 12-13 (2d Cir. 1985)).  Prison officials may regulate the right to receive and send non-legal mail if the restrictions they employ are "reasonably related to legitimate penological interests." Thornburgh v. Abbott, 490 U.S. 401, 409 (1989) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).  To state a First Amendment claim related to interference with incoming or outgoing non-legal mail, a prisoner must allege that officials engaged in "a pattern or

practice of interference" without a "legitimate penological" justification. <u>Thomas v. Washburn</u>, No. 13-CV-303V(F), 2016 WL 6791125, at *2-3 (W.D.N.Y. Sept. 7, 2016) ("[T]hree interferences with Plaintiff's out-going mail as alleged by Plaintiff fails to establish an actionable pattern or practice sufficient to state a claim for a First Amendment mail violation."), <u>report and recommendation adopted</u>, No. 13-CV-303V(F), 2016 WL 6778794 (W.D.N.Y. Nov. 16, 2016).

There are no factual allegations to plausibly suggest that the censorship of the letter addressed to Velez-Shade's aunt was part of a pattern or practice of interference with mail. Rather, the interference with mail occurred on one day. Nor has Velez-Shade alleged that he suffered any injury due to the fact that his letter did not reach his aunt. He does not allege that he was unable to pursue a legal action or have access the courts. Nor does he allege that he could not reach his aunt by telephone. Approximately two months after attempting to send a letter to his aunt regarding alleged due process violations by prison officials, Velez-Shade filed this action. Accordingly, the First Amendment claim that Mailroom Officer DeJesus interfered with Velez-Shade's outgoing mail on one occasion fails to state a claim upon which relief may be granted and is dismissed. <u>See</u> 28 U.S.C. § 1915A(b)(1).

D.    <u>Eighth Amendment</u>

Velez-Shade alleges that Officer Richards failed to protect him from harm and that Lieutenant Alexander, Captain Lizon, and Warden Rodrigues subjected him to restrictive or unconstitutional conditions of confinement. The court construes these claims as arising under the Eighth Amendment.

In the context of a prisoner's conditions of confinement, those conditions that are "restrictive or even harsh," but which "cannot be said to be cruel and unusual under

contemporary standards" do not violate the Eighth Amendment because "they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Although the Constitution does not require "comfortable" prison conditions, it does not permit prison officials to maintain conditions which inflict "unnecessary and wanton pain" or which result in the "serious deprivation of basic human needs . . . or the minimal civilized measure of life's necessities." Id. In addition, the Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of inmates in their custody" and to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 832-33 (1994) (internal quotation marks and citations omitted).

To state a claim of failure to protect or deliberate indifference to health or safety due to unconstitutional conditions of confinement, an inmate must demonstrate both an objective and a subjective element. To meet the objective element, the inmate must allege that he was incarcerated under a condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human need[ ]" or posed "a substantial risk of serious harm" to his health or safety. Farmer, 511 U.S. at 834; Rhodes, 452 U.S. at 347. The Supreme Court has identified the following basic human needs or life necessities of an inmate: food, clothing, shelter, medical care, warmth, safety, sanitary living conditions, and exercise. See Wilson v. Seiter, 501 U.S. 294, 304 (1991); DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989); Rhodes, 452 U.S. at 348. In Wilson, the Supreme Court observed that "some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually

enforcing effect that produces the deprivation of a single, identifiable human need . . . ." Wilson, 501 U.S. at 304 (emphasis and citations omitted).

To meet the subjective element, an inmate must plausibly allege that the defendants possessed culpable intent; that is, the officials knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action.  See Farmer, 511 U.S. at 834, 837.  Thus, an allegation of "mere negligen[t]" conduct is insufficient.  Id. at 835.  Rather, the subjective element requires that the inmate allege that defendants acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law."  Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006).

### 1.     Failure to Protect

Velez-Shade claims that Officer Richards observed him fighting with two other inmates, but Officer Richards waited almost two minutes to try to stop the fight.  The court concludes that Velez-Shade has alleged that he faced a substantial risk of serious injury because Officer Richards did not intervene immediately to stop the altercation. Thus, he has met the objective prong of the Eighth Amendment failure to protect standard.

With regard to the subjective prong, Velez-Shade has not plausibly alleged Officer Richards' decision to wait less than two minutes to act or intervene constituted deliberate indifference to his health or safety.  The facts suggest that Officer Richards was alone when the altercation broke out involving Velez-Shade and two other inmates. See Compl. at 13.  Velez-Shade has not alleged that Officer Richards could have safely intervened by himself to stop the altercation that involved three inmates.  Thus, Velez-Shade has not plausibly alleged that Officer Richards was deliberately indifferent to

Velez-Shade's safety by declining to immediately intervene in the altercation and waiting less than two minutes to take action. Compare Stubbs v. Dudley, 849 F.2d 83, 86–87 (2d Cir. 1988) (concluding that deliberate indifference is shown when an officer fails to act when there is no risk to himself or to the security of the prison), with Lawrence v. Rodak, No. 11-CV-6115-FPG, 2014 WL 4829418, at *3 (W.D.N.Y. Sept. 29, 2014) ("Rodak's delay in intervening until other officers arrived was not a failure to act."); Blaylock v. Borden, 547 F.Supp.2d 305, 312 (S.D.N.Y. 2008) (awaiting assistance was reasonable when the officer was alone with two inmates); Williams v. Russo, 01–CV–6401, 2009 WL 185758 at *2 (W.D.N.Y. Jan. 26, 2009) (finding that it was unsafe for two officers to enter a room with six inmates to break up a fight between two of them). The court concludes that Velez-Shade has not stated a plausible Eighth Amendment failure to protect claim against Officer Richards and the claim is dismissed. See 28 U.S.C. § 1915A(b)(1).

### 2. Conditions of Confinement at Carl Robinson

Velez-Shade alleges that from June 16, 2018 to June 29, 2018, during his confinement in the restrictive housing unit at Carl Robinson, Lieutenant Alexander failed to permit him to participate in either outdoor or indoor recreation. In addition, every day and night, she permitted a bright light to illuminate his cell.

### a. Recreation

Velez-Shade alleges that he was unable to participate in outdoor or indoor recreation for thirteen days. He contends that he lost weight and muscle mass during the thirteen-day period because he was not exercising regularly.

It is well-established that exercise constitutes a basic human need that is protected under the Eighth Amendment. See Wilson, 501 U.S. at 304–05; Dumpson v.

<u>McGinnis</u>, 348 F. App'x. 658, 659 (2d Cir. 2009); <u>Williams v. Greifinger</u>, 97 F.3d 699, 704 (2d Cir. 1996). The restriction on Velez-Shade's participation in recreation at Carl Robinson was only temporary and did not significantly affect his health. Furthermore, Velez-Shade does not allege that he could not perform exercises in his cell. Although a denial of all opportunities to exercise for an extended period of time might constitute a serious deprivation of a basic human need under the objective prong of the Eighth Amendment, courts have routinely held that a denial of the opportunity to exercise for a short period of time does not constitute a sufficiently serious deprivation. <u>See, e.g.</u>, <u>Branham v. Meachum</u>, 77 F.3d 626, 630–31 (2d Cir.1996) (holding that keeping plaintiff on full restraint status without outdoor recreation for 22 days does not state an Eighth Amendment claim); <u>Torrez v. Semple</u>, No. 3:17-CV-1232 (SRU), 2018 WL 2303018, at *6 (D. Conn. May 21, 2018) (denial of recreation for 10 days did not "state[ ] plausible Eighth Amendment claim"); <u>Houston v. Goord</u>, No. 9:03cv1412 (GTS/DEP), 2009 WL 890658, at *4 (N.D.N.Y. Mar. 31, 2009) (holding plaintiff's Eighth Amendment claim not cognizable because the denial of outdoor activity for less than two weeks was <u>de minimis</u>); <u>Shakur v. Sieminski</u>, 3:07cv1239 (CFD), 2007 WL 2151174, at *5 (D. Conn. July 15, 2007) (stating that "[a]lthough the Second Circuit has approved one hour of outdoor recreation per day, it has not held that amount to be the constitutional minimum") (internal citations omitted); <u>Davidson v. Coughlin</u>, 968 F.Supp.121, 131 (S.D.N.Y. 1997) (holding that deprivation of exercise for 14 days did not violate the Eighth Amendment).

Because Velez-Shade has alleged that Lieutenant Alexander denied him the opportunity to participate in recreation for only thirteen days during his confinement at

Carl Robinson, the court concludes that he has not stated a plausible claim of a serious deprivation of a basic human need. The denial of recreation claim against Lieutenant Alexander is dismissed. See 28 U.S.C. § 1915A(b)(1).

    b.    Illumination of Cell

Velez-Shade alleges that he lost countless hours of sleep because there was a bright light shining on him every day and night during his confinement in his cell in the restrictive housing unit at Carl Robinson. The lack of sleep caused him to experience "crucial symptoms of [his] P.T.S.D. as well as his bipolar one." Compl. at 9 ¶ 25.

The Second Circuit has observed that "sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." Walker v. Schult, 717 F.3d 119, 126 (2d Cir. 2013) (collecting cases). Thus, "[r]equiring inmates to live in constant illumination can . . . under certain circumstances, rise to the level of an Eighth Amendment violation." Jones v. Rock, No. 9:12–CV–447 (NAM/TWD), 2013 WL 4804500, *10 (N.D.N.Y. Sept. 6, 2013).

Velez-Shade has plausibly alleged that the constant illumination of his cell in the restrictive housing unit for thirteen days caused him to lose sleep, a basic human need. Furthermore, the loss of sleep exacerbated his mental health conditions. Velez-Shade claims that Lieutenant Alexander either imposed the condition or permitted officers in the unit to deny Velez-Shade's requests to turn the light off. Thus, Velez has stated a plausible claim of deliberate indifference to his health against Lieutenant Alexander. See Abreu v. Farley, No. 6:11-CV-06251 EAW, 2019 WL 1230778, at *20 (W.D.N.Y. Mar. 15, 2019) (declining to grant summary judgment to defendants where plaintiff provided evidence that he "suffered periods of 24-hour illumination of his prison cell,

which resulted in headaches, eye problems, depression, and the inability to sleep for close to two weeks").

### 3. Conditions of Confinement at Northern

Velez-Shade alleges that, during his confinement at Northern from June 29, 2018, until October 10, 2018, Warden Rodrigues and Captain Lizon required him to: (1) be strip-searched every time that he left his cell; (2) go outside to recreate in any kind of weather; (3) be handcuffed behind his back when exercising in the recreation yard; and (4) be handcuffed in the front, placed in leg shackles, and wear a tether chain when speaking to his family on the telephone. In addition, on one occasion in October 2018, Warden Rodrigues and Captain Lizon left Velez-Shade in a cell with a toilet that was backed up with urine and feces for more than forty hours.

#### a. Clogged Toilet

Velez-Shade states that, at some point on October 8, 2018, the toilet in the cell next to his cell backed up into his toilet. He was exposed to a toilet full of feces and urine for over forty hours. Furthermore, Velez-Shade has alleged that Warden Rodrigues and Captain Lizon were aware of the condition but did not move him from the cell for over forty hours.

The court concludes that this allegation of unsanitary living conditions was of sufficient duration to constitute a serious deprivation of basic human need. Thus, Velez has stated a plausible claim of deliberate indifference to a basic human need—sanitary living conditions—against Warden Rodrigues and Captain Lizon. See Wiley v. Kirkpatrick, 801 F.3d 51, 66–68 (2d Cir. 2015) (explaining that claims of allegedly unconstitutional unsanitary conditions of confinement must be analyzed based on their severity and duration); Walker, 717 F.3d at 127 ("Indeed, unsanitary conditions lasting

for mere days may constitute an Eighth Amendment violation.").  This Eighth

Amendment claim of unsanitary living condition will proceed against Warden Rodrigues

and Captain Lizon in their individual capacities.

b.      Handcuffing – Telephone Use and Recreation

Velez-Shade claims that he was required to recreate in handcuffs behind his

back in all kinds of weather and was required to wear handcuffs, leg shackles, and a

tether chain during his telephone calls with his family.  He experienced shoulder, neck,

and back pain from the restraints and became sick at times because he was forced to

recreate outside in the rain.  Because it was not uncommon for inmates to slip out of

their handcuffs, Velez was exposed to a risk of assault by other inmates in the

recreation yard.  Velez-Shade alleges that he was confined at Northern for

approximately four months from June 29, 2018, until October 10, 2018.

Given the allegations regarding the severity of the restraint requirements to which

he was exposed, together with the duration of his exposure, the court concludes that

Velez-Shade has stated a plausible claim of deliberate indifference to his health against

Warden Rodrigues and Captain Lizon.

E.      Fourth Amendment

Velez-Shade claims that Warden Rodrigues and Captain Lizon required him to

submit to a strip search every time that he left his cell to go to another part of his

housing unit or the prison facility.  The strip search involved Velez-Shade having to

squat and cough.  The Second Circuit has recently "reiterate[d] that Inmates retain a

limited right of bodily privacy under the Fourth Amendment."  Harris v. Miller, 818 F.3d

49, 57 (2d Cir. 2016).  In evaluating a claim of a violation of right of bodily privacy, a

court is required to make two determinations: "(1) . . . whether the inmate has

17

'exhibit[ed] an actual, subjective expectation of bodily privacy,' and (2) . . . 'whether the prison officials had sufficient justification to intrude on [the inmate's]'" expectation of bodily privacy.  See id. (quoting Covino v. Patrissi, 967 F.2d 73, 77-78 (2d Cir. 1992)).

As to the first inquiry, there is no dispute that a visual body cavity search is a "serious invasion of privacy."  Id. at 58 (quoting Florence v. Board of Chosen Freeholders, 566 U.S. 318, 344-45 (2012) (internal quotation marks omitted).  Thus, for purposes of this ruling only, the court will assume that Velez-Shade had a subjective expectation of privacy.

As to the second inquiry, "courts apply one of two separate but overlapping frameworks. If the inmate's Fourth Amendment claim challenges a prison regulation or policy, courts typically analyze the claim under Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)."  Harris, 818 F.3d at 57.  Courts determine whether the regulation is "reasonably related to legitimate penological interests . . . with reference to four factors discussed in Turner."  Harris, 818 F.3d at 57-58.  However, where the inmate challenges particular searches of his person, rather than an overarching policy, courts apply a four-factor test established in Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).  See Harris, 818 F.3d at 58.

It is unclear, based on the allegations in the Complaint, whether Velez-Shade seeks to argue that there was a general policy in place which violated his Fourth Amendment rights, or whether he is alleging that Warden Rodrigues and Captain Lizon violated his rights in the context of isolated incidents.  The Complaint contains neither allegations as to a generally applicable policy or regulation, nor facts detailing the nature of any particular strip searches.  Rather, the Complaint contains only the general

allegation that Velez-Shade was strip-searched "before leaving [his] cell and must squat down and cough."  Compl. at 11 ¶ 1.  Absent plausible factual allegations detailing either a policy which violated Velez-Shade's rights, or plausible allegations as to specific searches of his person, the Complaint fails to state a claim upon which relief may be granted.  The Fourth Amendment claims against Warden Rodrigues and Captain Lizon are dismissed without prejudice.  28 U.S.C.A. § 1915A(b).

F.      Fifth Amendment

Velez-Shade alleges that the defendants violated his right to due process under both the Fifth and the Fourteenth Amendments in connection with the disposition of the disciplinary report issued to him on June 22, 2018, and his placement in the security risk group program on June 29, 2018.  The Fifth Amendment, however, applies to the federal government, not to the states.  See Dusenbery v. United States, 534 U.S. 161, 167 (2002) (holding Fifth Amendment's Due Process Clause protects citizens against only federal government actors, not State officials); Mitchell v. Home, 377 F.Supp.2d 361, 372–73 (S.D.N.Y. 2005) (dismissing Fifth Amendment due process claim asserted against employee of the state of New York because "[a]ny due process rights [the] plaintiff enjoys as against state government officials . . . arise solely from the Fourteenth Amendment due process clause") (citation omitted)).

Velez-Shade has not raised any claim against a federal government actor.  Thus, his Fifth Amendment due process claims are dismissed.  See 28 U.S.C. § 1915A(b)(1).

G.      Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause "protects persons against deprivations of life, liberty, or property."  U.S Const. amend. XIV.  "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process

Clause itself and the laws of the States." Hewitt v. Helms, 459 U.S. 460, 466 (1983). The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (per curiam).

In Sandin v. Conner, 515 U.S. 472 (1995), the Supreme Court recognized that "[s]tates may under certain circumstances create liberty interests which are protected by the Due Process Clause." Id. at 483-84. A prisoner has a protected liberty interest in not being confined only if the state created such an interest in a statute or regulation and the deprivation of that interest caused him to suffer an atypical and significant hardship. See Tellier v. Fields, 280 F.3d 69, 80-81 (2d Cir. 2000).

1. June 22, 2018 Disciplinary Report

Velez-Shade suggests that he received a disciplinary report in connection with the altercation that he was involved in on June 16, 2016, at Carl Robinson and that he received a sanction of seven days of punitive segregation in connection with the disposition of that disciplinary report. He states that, on June 22, 2018, he completed his seven-day period of confinement in the RHU. He does not challenge the process that he received in connection with the disciplinary report arising from the June 16, 2018 altercation.

He alleges that on June 22, 2018, before officials released him from the RHU, Lieutenant Alexander issued him a disciplinary report for security risk group affiliation. Correctional Officers Betances and Clark subsequently investigated the disciplinary charge and appeared at the hearing held on June 26, 2018. Lieutenant Prior presided

20

over the hearing, and Correctional Officer Rodriguez appeared as Velez-Shade's advocate.  Velez-Shade pleaded not guilty to the disciplinary charge, but Lieutenant Prior found him guilty of security risk group affiliation and designated him as a member of a security risk group.  Velez-Shade does not allege that Lieutenant Prior imposed any sanctions against him in connection with the guilty finding.  Velez-Shade remained in the RHU until prison officials transferred him to Northern on June 29, 2018 to begin the security risk group program.

The Second Circuit has held that "in determining whether [an inmate] endured an atypical and significant hardship" a district court should consider the duration of the inmate's confinement in segregation and "the extent to which the conditions [in] . . . segregation differ from other routine prison conditions."  Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (internal quotation marks and citation omitted).  With regard to duration, the Second Circuit has resisted establishing a "bright line rule that a certain period of . . . confinement [in a restrictive housing unit] automatically fails to implicate due process rights."  Id.

As indicated above, Velez-Shade contends that he endured unconstitutional conditions of confinement including a denial of recreation and deprivation of sleep during the thirteen-day period that he was in the RHU before and after the disposition of the June 22, 2018 disciplinary report.  In particular, Velez-Shade alleges that he was unable to sleep because of continuous illumination in his cell, and that the deprivation of sleep which resulted from the constant illumination triggered his PTSD symptoms.

The Second Circuit has noted that, "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of

time spent in [restrictive housing] was exceedingly short—less than the 30 days that the Sandin plaintiff spent in [restrictive housing]—and there was no indication that the plaintiff endured unusual [restrictive housing] conditions." Palmer, 364 F.3d at 65–66. Here, Velez-Shade was exposed to the conditions in the RHU less than 30 days. Furthermore, the Complaint does not allege that Velez-Shade's conditions of confinement were unusual relative to other inmates in general population, and although courts have an obligation to interpret a pro se complaint liberally, a complaint must still include sufficient factual allegations to meet the standard of facial plausibility. See Harris v. Mills, 572 F.3d at 72 (citations omitted). In this case, the Complaint fails to allege any facts as to Velez-Shade's conditions of confinement in the RHU relative to the normal conditions of confinement in the prison. See Welch v. Bartlett, 196 F.3d 389, 393 (2d Cir. 1999) ("Whether the conditions of Welch's confinement constitute an atypical and significant hardship requires that they be considered in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.").

The court concludes that, absent any facts plausibly alleging that Velez-Shade's conditions of confinement in the RHU were atypical in comparison to the norm, the Complaint fails to state a claim upon which relief may be granted. The Fourteenth Amendment due process claim against Lieutenants Alexander and Prior, Correctional Officers Betances and Clark, and District Administrator Quiros, in connection with the issuance and disposition of the June 22, 2018 disciplinary charge as well as the appeal of disposition of the disciplinary charge, is dismissed. See 28 U.S.C. § 1915A(b)(1).

The court further notes that the only allegation against Correctional Officer Rodriguez is that he or she appeared at the disciplinary hearing as Velez-Shade's advocate. Velez-Shade does not assert that Officer Rodriguez failed to provide him with assistance or otherwise deprived him of due process in connection with the disciplinary hearing. Thus, Velez-Shade has not alleged that Officer Rodriguez violated his federally or constitutionally protected rights. The Fourteenth Amendment due process claim against Officer Rodriguez is dismissed. See 28 U.S.C. § 1915A(b)(1).

### 2. Placement in Security Risk Group Program

Velez-Shade also challenges his placement in the security risk group program on June 29, 2018. He contends that he did not receive a hearing or any other separate proceeding or review before his transfer to Northern to begin the program.

The Second Circuit has held that "[a] state-created liberty interest 'arises when state statutes or regulations require, in language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates.'" Vega v. Lantz, 596 F.3d 77, 83 (2d Cir. 2010) (quoting Welch, 196 F.3d at 392 (internal citations and quotation marks omitted)). In Connecticut, Administrative Directive 6.14 governs the procedures for security risk groups. See State of Connecticut Department of Correction, Administrative Directive 6.14 ("AD 6.14"). AD 6.14 establishes certain mandatory predicates for the designation of inmates as security risk group members. See id. § 6 (defining "Security Risk Group Member Designation Process."). Velez-Shade therefore had a liberty interest in avoiding designation as a security risk group member and the related placement in SRG. See id. § 6(B)–(C).

Velez-Shade must also demonstrate that he was subjected to "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Sandin, 515

U.S. at 484. Velez-Shade alleges that he endured various restrictive conditions during his four-month confinement in the security risk group program, including strip searches every time he left his cell and recreation in handcuffs behind his back. Moreover, AD 6.14 requires, inter alia, that all Phase 1 SRG members "be handcuffed behind the back for all out of cell movement," and limits visitation to non-contact visits with immediate family. AD 6.14 § 11(N), (V). While the Complaint does not allege these limitations, the court takes judicial notice of the Administrative Directives. Velez-Shade's allegations, combined with the limitations mandated by AD 6.14, are sufficient to plausibly allege that he endured conditions of confinement in the security risk group program at Northern that were atypical and significant, when compared with the general prison population. See Welch, 196 F.3d at 392 ("[A]ctions under the Due Process Clause are reserved for prisoners enduring a hardship that is substantially more grave than hardships they would be likely to endure simply as a consequence of the ordinary administration of the prison.").

Velez-Shade contends that he did not receive a separate hearing or review before his transfer to Northern and placement in the security risk group program. Absent a separate hearing or proceeding or notice that the disciplinary hearing was also a classification hearing to determine his placement in the security risk group program, it is apparent that Velez-Shade did not have an opportunity to defend against the change in his classification.

The court concludes that Velez-Shade has stated a plausible procedural due process claim with regard to his transfer to Northern and placement in the security risk group program on June 29, 2018. This Fourteenth Amendment procedural due process

claim will proceed against Lieutenant Prior and Director of Security Santiago in their individual capacities.

      H.    <u>Claims under the Connecticut Constitution</u>

      In addition to his federal constitutional claims, Velez-Shade contends that the defendants violated his rights under Article First §§ 4, 5, 8, 9, and 20 of the Connecticut Constitution. Article First, § 4 of the Connecticut Constitution provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Conn. Const. art. 1 § 4. Article First, section 5 provides: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press." Conn. Const. art. 1, § 5. Article First, § 8 provides in pertinent part: "No person shall be . . . deprived of life, liberty or property with due process of law. . . ." Conn. Const. art. 1, § 8. Article First, § 9 provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law." Conn. Const. art. 1, § 9. Article First § 20 provides that "[n]o person shall be denied equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

      In <u>Binnette v. Sabo</u>, 244 Conn. 23, 41-47 (1998), the Connecticut Supreme Court relied on <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), to recognize a private cause of action for monetary damages against municipal police officers for violations of Article First, §§ 7 and 9 of the Connecticut Constitution that arose out of an alleged unreasonable search and seizure and unlawful arrest of the plaintiff. In reaching its decision, the Connecticut Supreme Court "emphasize[d] that [its] decision to recognize a <u>Bivens</u>-type remedy in this case does

not mean that a constitutional cause of action exists for every violation of our state constitution." Id. at 47.

       1.     Article First, Sections 8 and 20

This court and the Connecticut Superior Court have routinely declined to recognize a private right of action under Article first §§ 8 and 20 of the Connecticut Constitution. See, e.g., Richard v. Strom, No. 3:18-CV-1451 (CSH), 2018 WL 6050898, at *8 (D. Conn. Nov. 19, 2018) ("There is no established private right of action under the religious discrimination, due process, or equal protection provisions (Article First §§ 3, 8, and 20 of the Connecticut Constitution.")); Minto v. Dep't of Mental Health & Addiction Servs., No. HHDCV176076730S, 2018 WL 710124, at *9 (Conn. Super. Ct. Jan. 11, 2018) ("Connecticut courts have unanimously declined to recognize a private cause of action under article first, § 20"); Doe v. Crowley v. Town of Enfield, No. 3:14 cv 01903 (MPS), 2015 WL 4162435, at *3 (D. Conn. July 9, 2015) (declining to recognize a private right of action under Article First, §§ 8 and 20); Gothberg v. Town of Plainville, 148 F. Supp. 3d 168, 187-88 (D. Conn. 2015) (declining to exercise supplemental jurisdiction over state constitutional claim under Article First, section 8 because decision to recognize private right of action under this section raises novel or complex issue of state law); Johnson v. State Dep't of Children & Families, No. 3:11cv996(WWE), 2012 WL 6049583, at *5 (D. Conn. Dec. 5, 2012) ("[T]he Court will join numerous courts that have declined to recognize a private right of action pursuant to Article First, § 20"); Silvera v. Connecticut Dep't of Corr., 726 F. Supp. 2d 183, 199 (D. Conn. 2010) (declining to recognize a private right of action under, inter alia, Article First § 20).

The court concludes that it would be inappropriate to exercise supplemental jurisdiction over potential claims under the Connecticut constitution that raise new and

undeveloped issues under state law.  See 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim" that "raised a novel or complex issue of State Law . . . .").  Accordingly, the court declines to exercise supplemental jurisdiction over the claims that the defendants violated Velez-Shade's rights under Article First, §§ 8 and 20 of the Connecticut Constitution.

2.     Article First, Sections 4 and 5

Velez-Shade alleges that Mailroom Officer DeJesus violated his rights under two of Connecticut's constitutional provisions governing free speech, Articles First, §§ 4 and 5, by censoring a letter that he sought to mail to his aunt.  An individual's right to freedom of speech under the Connecticut Constitution derives from Article First, § 4. The Connecticut Supreme Court has held that Article First, § 5 "literally applies only to the passage of laws restraining freedom of speech or press and does not by its terms afford protection provided by § 4 against restrictions the exercise of those rights which government officials may impose whether or not sanctioned by law."  Cologne v. Westfarms Associates, 192 Conn. 48, 63 (1984).

Velez-Shade does not challenge a state statute as being violative of his right to free speech.  Thus, Velez-Shade has failed to state a claim of a violation of Article First, § 5 and the claim is dismissed.  See Niblack v. Brighthaupt, No. CV155035513, 2018 WL 1386211, at *5 (Conn. Super. Ct. Feb. 20, 2018) (dismissing inmate's claim that rejection and return of packages by mail room staff at prison facility violated his right to free speech under Article First, § 5 of the Connecticut Constitution because claim did not relate to the passage of a law restraining freedom of speech) (citing Cologne, 192 Conn. at 63).

In Lopez v. Smiley, 375 F. Supp. 2d 19 (D. Conn. 2005), the court acknowledged that the Connecticut Supreme Court had recognized a private right of action under Article First, §§ 4, 5, and 14 for declaratory or injunctive relief, but noted the absence of Connecticut state court cases recognizing a private right of action for money damages under Article First, § 4. See id. at 24 n.2 (collecting cases). Research has revealed no cases since Lopez that have recognized a claim for money damages under Article First, § 4.[2] See Williams v. Walter Ford, No. 3:14-CV-1181 (VAB), 2015 WL 8490910, at *9 (D. Conn. Dec. 10, 2015) (finding "no state cases recognizing a claim for money damages under this [free speech] provision" of the Connecticut Constitution) (citing Marshall v. Town of Middlefield, No. 3:10-cv-1009(JCH), 2012 WL 601783, at *9 (D. Conn. Feb. 23, 2012) ("The court finds no cases in which a Connecticut court has recognized a private right of action for money damages under either § four or twenty and multiple cases in which courts have expressly declined to recognize such claims.")). Accordingly, the court declines to exercise supplemental jurisdiction over the claim that the Mailroom Officer DeJesus violated Velez-Shade's rights under Article First, § 4 of the Connecticut Constitution.

3.    Article First, Section 9

It is unclear how Article First, § 9 is applicable to Velez-Shade's due process claims relating to the disposition of a disciplinary report and his placement in the security risk group program. See Compl. at 13-16. Velez-Shade also alleges that

---

[2] Furthermore, "Connecticut courts have rejected the argument that the free-speech provisions of the Connecticut Constitution are independently actionable apart from the cause of action that is prescribed under § 13-52q." Jennings v. Town of Stratford, 263 F. Supp. 3d 391, 409 (D. Conn. 2017) (citing Thibault v. Barkhamsted Fire Dist., No. CV136008093S, 2013 WL 6038259, at *5 (Conn. Super. Ct. Oct. 21, 2013); Blue v. Carbonaro, No. CV146015705S, 2015 WL 3555294, at *21 (Conn. Super. Ct. May 11, 2015)).

Lieutenant Alexander violated his rights under Article First, § 9 by subjecting him to restrictive or uncomfortable conditions of confinement for thirteen days at Carl Robinson.  See id. at 15.  The court cannot locate any cases in which a Connecticut state court has recognized a private right of action for money damages under Article First, § 9 of the Connecticut Constitution for a claim that prison officials subjected an inmate to unconstitutional conditions of confinement   See Torres v. Armstrong, No. CV990427057S, 2001 WL 1178581, at *6 n.6 (Conn. Super. Ct. Sept. 6, 2001) (declining to recognize a damages action under Article First, § 9 of the Connecticut Constitution).  Thus, Velez-Shade in effect is requesting that this court recognize a new state constitutional tort cause of action asserted by a state prisoner against Department of Correction employees.

The court declines to exercise supplemental jurisdiction over the claim seeking monetary damages for a violation of Article First, § 9 of the Connecticut Constitution because the recognition of a new state constitutional tort should be considered and determined by the Connecticut courts.  See M.A. v. City of Torrington, No. 3:10CV1890 (JBA), 2012 WL 3985166, at *4 (D. Conn. Sept. 10, 2012) ("[T]he Court declines to exercise supplemental jurisdiction over Plaintiffs' constitutional claims, leaving any such recognition of new state constitutional torts to Connecticut courts, based on the case-by-case approach of Binette and on considerations of federal-state comity."); Lopez, 375 F. Supp. 2d at 26 ("In light of the Connecticut Supreme Court's explicit statement in Binette that the Supreme Court did not intend to create a cause of action for money damages for every alleged violation of the Connecticut state constitution, . . . and the fact that federalism and comity concerns strongly suggest that recognition of

new state constitutional torts should be determined on a case-by-case basis by <u>Connecticut</u> <u>courts</u> in the first instance, this Court will refrain from exercising supplemental jurisdiction over . . . Mr. Lopez's Connecticut constitutional claims.").

## ORDERS

The court enters the following orders:

(1)      The official capacity request for monetary damages is **DISMISSED** pursuant to pursuant to 28 U.S.C. § 1915A(b)(2).  The following claims are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1): The official capacity request for declaratory relief; all claims against Population Management and SRG Coordinator Aldi; the Fifth Amendment due process claim; the First Amendment claim against Mailroom Officer DeJesus; the Eighth Amendment failure to protect claim against Correctional Officer Richards; the Eighth Amendment denial of recreation claim against Lieutenant Alexander; the Fourteenth Amendment  procedural due process claim related to the disposition of the June 22, 2018 disciplinary report against Lieutenants Alexander and Prior, Correctional Officers Betances and Clark, and District Administrator Quiros; the Fourteenth Amendment due process claim against Correctional Officer Rodriguez; the Fourth Amendment claim against Warden Rodrigues and Captain Lizon related to strip searches performed on Velez-Shade during his confinement at Northern; and the claim that Mailroom Officer Richards violated Velez-Shade's rights under Article First, § 5 of the Connecticut Constitution.  The court declines to exercise supplemental jurisdiction over the claims that the defendants violated Velez-Shade's rights under Article First, §§ 4, 8, 9, and 20 of the Connecticut Constitution.

The following claims will proceed against the defendants in their individual capacities: The Eighth Amendment claim against Lieutenant Alexander related to the constant illumination of Velez-Shade's cell during his confinement at Carl Robinson; the Eighth Amendment claims against Warden Rodrigues and Captain Lizon related to handcuffing requirements during telephone calls and recreation, conditions in the recreation yard, and exposure to an unsanitary condition of confinement for over forty hours during Velez-Shade's confinement at Northern from January 29, 2018 to October 10, 2018; and the Fourteenth Amendment procedural due process claim related to the placement of Velez-Shade in the Security Risk Group Program at Northern on January 29, 2018, against Lieutenant Prior and Director of Security Santiago.

(2)     Within twenty-one (21) days of this Order, the Clerk shall verify the current work addresses of: Director of Security Antonio Santiago, Warden Rodrigues, Captain Lizon, Lieutenant Alexander, and Hearing Officer Prior, and mail a copy of the Complaint, this Order, and a waiver of service of process request packet to each defendant in his or her individual capacity at his or her confirmed address.  On the thirty-fifth (35th) day after mailing, the Clerk shall report to the court on the status of each request. If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3)     The defendants shall file their response to the Complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If the defendants choose to file

an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(4)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this Order. Discovery requests need not be filed with the court.

(5)     All motions for summary judgment shall be filed within seven months (210 days) from the date of this Order.

(6)     The Clerk shall send a copy of the Complaint and this Order to the Connecticut Attorney General and to the Department of Correction Legal Affairs Unit.

**SO ORDERED.**

Dated at New Haven, Connecticut this 24th day of September 2019.


          /s/
          Janet C. Hall
          United States District Judge